United States Court of Appeals,

Eleventh Circuit.

No. 97-6162.

Judith A. NEELLEY, Petitioner-Appellant,

v.

John E. NAGLE, Warden, State of Alabama, Respondents-Appellees.

April 9, 1998.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV-96-PT-1381-M), Robert B. Propst, Judge.

Before HATCHETT, Chief Judge, and EDMONDSON and COX, Circuit Judges.

COX, Circuit Judge:

Judy Neelley appeals the district court's denial of her habeas corpus petition in connection with her conviction for the kidnaping and murder of a 13-year-old girl. In her petition Neelley alleges that her trial counsel was ineffective because he operated under a conflict of interest. The district court considered the petition under the standards found in the Anti-Terrorism and Effective Death Penalty Act of 1996. We affirm.

I. BACKGROUND

Judy Neelley participated in a scheme in which she attempted to lure girls and young women into her car for the ultimate purpose of making them available to her husband, Alvin Neelley, for his sexual pleasure. As a part of this scheme, Judy Neelley abducted 13-year-old Lisa Ann Millican from a mall in Rome, Georgia, taking her to a motel room and handcuffing her to a bed to prevent her escape. After Alvin Neelley raped the girl over the course of several days, the Neelleys took Millican to the rim of Little River Canyon near Fort Payne, Alabama. There, Judy Neelley injected Millican with drain cleaner six times in an attempt to kill her. When this failed, Neelley shot her

in the back and pushed her into the canyon.

Eventually, the Neelleys were arrested in Tennessee on bad check charges, and Judy Neelley was extradited to Alabama to stand trial for Millican's murder. She was tried in the Circuit Court for DeKalb County, Alabama. The trial judge found that Neelley was indigent and appointed local attorney Robert B. French, Jr. to represent her.

At trial, French presented the defense that Neelley was not criminally responsible for her actions because her husband had forced her to abduct and kill Lisa Ann Millican. Neelley testified that her husband habitually abused her and that her will had been subjugated to his through fear. The jury did not accept Neelley's defense and found her guilty of the capital crime of murder during the course of a kidnaping. At the penalty phase of the trial, the jury recommended by a vote of ten to two that Neelley be sentenced to life imprisonment without parole. The trial judge, however, overrode the jury's sentencing recommendation and sentenced Neelley to death.

On direct appeal, the Alabama state courts affirmed Neelley's conviction and death sentence, *see Neelley v. State,* 494 So.2d 669 (Ala.Crim.App.1985), *aff'd, Ex parte Neelley,* 494 So.2d 697 (Ala.1986), and the United States Supreme Court denied her petition for a writ of certiorari, *see Neelley v. Alabama,* 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987). Neelley then filed a petition for post-conviction relief in state court. That court denied this petition, a decision that the Alabama appellate courts upheld. *See Neelley v. State,* 531 So.2d 69 (Ala.Crim.App.1988), *cert. denied, Ex parte Neelley,* 537 So.2d 65 (Ala.1988), *cert. denied, Neelley v. Alabama,* 488 U.S. 1020, 109 S.Ct. 821, 102 L.Ed.2d 810 (1989). French represented Neelley throughout this time.

Next, represented by new counsel, Neelley filed in state court a second petition for post-conviction relief that included a claim that French's representation was unconstitutionally inadequate. The trial court held an evidentiary hearing on the ineffective-assistance-of-counsel

claim, but denied the petition; the Alabama Court of Criminal Appeals affirmed. *See Neelley v. State,* 642 So.2d 494 (Ala.Crim.App.1993). The Alabama Supreme Court initially granted Neelley's request for certiorari, but after hearing oral argument quashed the writ as improvidently granted. *See Ex parte Neelley,* 642 So.2d 510 (Ala.1994) (Almon and Steagall, JJ., dissenting). Neelley petitioned the United States Supreme Court for a writ of certiorari, which was denied. *See Neelley v. Alabama,* 514 U.S. 1005, 115 S.Ct. 1316, 131 L.Ed.2d 197 (1995).

Neelley then filed a § 2254 petition in the United States District Court for the Northern District of Alabama. The district court adjudicated her petition under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19, which established new standards for habeas review of state court decisions. The court denied the petition without an evidentiary hearing, but issued a certificate of appealability, noting that Neelley's petition raised novel issues regarding attorney conflicts of interest and the proper application of the AEDPA standards. Neelley now appeals.

## II. DISCUSSION

A. *Did the District Court Err in Applying the Amended Version of 28 U.S.C. § 2254 to Neelley's Petition?*

On April 24, 1996 President Clinton signed AEDPA into law. Title I of AEDPA amended the habeas corpus provisions of the United States Code, establishing new procedures and standards for use in habeas cases. Most significantly for purposes of this case, AEDPA establishes a more deferential standard of review of state court adjudications. Neelley contends that the district court erred in deciding to apply the amended version of § 2254(b), arguing (1) that AEDPA is an unconstitutional *ex post facto* law as applied to her petition, and (2) that the new habeas provisions are inapplicable to her case because Alabama has not taken advantage of AEDPA's "opt-in" provision.

1. *As Applied to Neelley's Petition, Is AEDPA an Unconstitutional Ex Post Facto Law?*

Neelley first argues that application of AEDPA to her petition would be fundamentally unfair and a violation of the Constitution's Ex Post Facto Clause, as AEDPA was not enacted until after she exhausted her state court remedies. This argument is without merit. In *Lindh v. Murphy,* --- U.S. ----, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), the Supreme Court addressed AEDPA's constitutionality as applied to pending habeas cases, specifically holding that AEDPA may constitutionally be applied to habeas cases filed after AEDPA's effective date. AEDPA's relevant provisions were enacted and became effective on April 24, 1996; Neelley filed her habeas petition a month later, on May 29, 1996. Under *Lindh,* AEDPA constitutionally may be applied to Neelley's petition.

2. *Are the Amended Sections of Chapter 153 Applicable to Habeas Petitions From Prisoners in States That Do Not "Opt In" to AEDPA's "Expedited" Habeas Provisions?*

AEDPA also added Chapter 154, "Special Habeas Procedures in Capital Cases," to Title 28 of the U.S.Code, providing for the expedited resolution of habeas cases in states that "opt in" to its provisions. To opt in, a state must establish procedures "for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners whose capital convictions and sentences have ... become final for State law purposes." *See* 28 U.S.C.A. § 2261(b) (West Supp.1997).

Neelley argues that the amended version of § 2254 does not apply to her petition because Alabama has not instituted the required counsel appointment procedures. She misreads the "opt-in" statute, which states specifically that "*[t]his chapter* [*i.e.,* Chapter 154] is applicable," if a state establishes the required procedures for appointment of counsel. 28 U.S.C.A. § 2261(b) (West Supp.1997) (emphasis added). Section 2254, on the other hand, is part of Chapter *153,* the "non-expedited" habeas procedures that apply to *all* habeas cases. Therefore, the applicability of

amended § 2254 is unaffected by whether a state has put appropriate counsel appointment mechanisms in place.[1]  The district court did not err in applying the amended § 2254 to Neelley's petition.

B. *Did the District Court Err in Its Analysis of Neelley's Claims Under 28 U.S.C. § 2254(d) as Amended by AEDPA?*

Amended § 2254(d) states in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (West Supp.1997).  Neelley challenges the district court's review of the state court's actions, arguing that the state court's adjudication of her claims indeed "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." Our task is to construe the meaning of this phrase consistent with Congress' intent, this being a question of first impression in this circuit.  We start with the plain language of the statute, *see Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979), and we assume "that the legislative purpose is expressed by the ordinary meaning of the words used," *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

1. *What Is the Proper Standard of Review Under § 2254(d) as Amended by AEDPA?*

---

[1]Neelley also argues in the alternative that the district court should have conducted an evidentiary hearing to determine whether Alabama has put in place the necessary counsel appointment mechanisms.  Because the new § 2254 applies regardless of whether Alabama has opted in, an evidentiary hearing is unnecessary.

a. *"Clearly Established"*

Section 2254 forbids federal courts from granting habeas relief for claims previously adjudicated by state courts, unless the state court adjudication was contrary to or represented an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." Thus, the first step in resolving a petitioner's claim is to determine the "clearly established" law at the relevant time. The "clearly established" language echoes the concerns underlying the Supreme Court's decisions in *Teague v. Lane*[2] and its progeny:

> Our holding in *Teague* rested upon the historic role of habeas corpus in our system of law, which is to provide a deterrence, the threat of which serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards. Deterrence and threat are meaningless concepts as applied to a situation in which the law is so uncertain that a judge acting in all good faith and with the greatest of care could reasonably read our precedents as permitting the result the habeas petitioner contends is wrong.

*Penry v. Lynaugh,* 492 U.S. 302, 352, 109 S.Ct. 2934, 2964, 106 L.Ed.2d 256 (1989) (Scalia, J., concurring in part, dissenting in part) (quotations and citations omitted); *see also, e.g., Hogan v. Hanks,* 97 F.3d 189, 192 (7th Cir.1996) ("Both *Teague* and the amended § 2254(d)(1) are designed to ensure that state judgments are not affected by legal rules established or materially expanded after the conviction has become final."), *cert. denied,* --- U.S. ----, 117 S.Ct. 1439, 137 L.Ed.2d 546 (1997). Under *Teague,* a federal court evaluating a petitioner's claim that he should have had the benefit of a rule of constitutional law must "survey the legal landscape" to determine whether the rule is "new." *Glock v. Singletary,* 65 F.3d 878, 884 (11th Cir.1995) (en banc), *cert. denied,* --- U.S. ----, 117 S.Ct. 616, 136 L.Ed.2d 540 (1996). A rule is not "new" if a state court considering a habeas petitioner's claim would have felt "compelled by existing precedent" to conclude that the rule the petitioner seeks was required by the Constitution. *See Caspari v. Bohlen,* 510 U.S. 383, 390, 114

---

[2]489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

S.Ct. 948, 953, 127 L.Ed.2d 236 (1994).  We think that a similar analysis obtains under the "clearly

established" language of § 2254, as a rule that is "new" cannot be "clearly established."  *See Hogan,*

*97 F.3d at 192* ("[A] rule [is] not "clearly established' unless it [is] "compelled by existing

precedent.' ").  Thus, a district court evaluating a habeas petition under § 2254(d) should "survey the

legal landscape" at the time the state court adjudicated the petitioner's claim to determine the

applicable Supreme Court authority;  the law is "clearly established" if Supreme Court precedent

would have compelled a particular result in the case.[3]

### b. "*Contrary To*"/"*Unreasonable Application Of*"

The other standard within § 2254(d) that requires interpretation is the requirement that the

state court adjudication "result[ ] in a decision ... contrary to, or involve[ ] an unreasonable

application of" the law.  At first glance each of these phrases could be read to swallow the other.

On one hand, it is difficult to imagine a decision "contrary to" existing Supreme Court precedent that

does not "involve an unreasonable application" of law.  On the other hand, a federal court reviewing

a state court decision in the context of a habeas petition could read the "contrary to" language as

permitting issuance of the writ whenever a state court errs, thereby vitiating the "unreasonable

application" clause.  Our interpretation of the statute, however, should not nullify either clause, but

should give effect to both.  *See United States v. Nordic Village, Inc.,* 503 U.S. 30, 36, 112 S.Ct.

1011, 1015, 117 L.Ed.2d 181 (1992).

Giving the phrase "contrary to" its plain meaning, we can readily think of two situations in

---

[3]The overlap between the statute and *Teague* is not complete.  For example, under *Teague* a rule is new if it is not clearly established at the time a habeas petitioner's conviction becomes final, whereas the language of § 2254 would seem to indicate that the law must be clearly established at the time the state court makes the adjudication under review.  However, we have no need to determine the exact overlap between *Teague* and § 2254 in this case because the Supreme Court case law governing Neelley's contentions was manifestly clear at all relevant times.

which a state court decision would be "contrary to" clearly established Supreme Court case law. The first is when a state court faces a set of facts that is essentially the same as those the Supreme Court has faced earlier, but given these facts the state court reaches a different legal conclusion than that of the Supreme Court. A second situation is one in which a state court, in contravention of Supreme Court case law, fails to apply the correct legal principles to decide a case. Such a result would be "contrary" in the sense that the state court has not adjudicated the claim in the manner prescribed by the Supreme Court. Both of these types of errors are errors of pure law; in the first case, a state court has denied a petitioner a constitutional right defined by the Supreme Court in its role as interpreter of the Constitution, while in the second the state court has failed to apply the proper law to a case. In either case, the federal court reviewing a petition under § 2254 independently determines what is "clearly established Federal law as determined by the Supreme Court" and may grant habeas relief if the state court has decided a question of law incorrectly.

If the state court has applied the proper law, the federal court must then determine whether the state court's application of that law was "unreasonable."[4] By its very language, "unreasonable application" refers to mixed questions of law and fact,[5] when a state court has "unreasonably"

---

[4]Like the "clearly established" requirement, this standard is akin to the *Teague* doctrine:

> At bottom ... the *Teague* doctrine validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.... Accordingly, we will not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court.

*O'Dell v. Netherland,* --- U.S. ----, ----, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997) (citations and quotations omitted).

[5]The Fifth and Seventh Circuits have considered the meaning of the statutory language and likewise have concluded that the two clauses give standards for review of questions of law ("contrary to") and mixed questions of law and fact ("unreasonable application of"). *See*

applied clear Supreme Court precedent to the facts of a given case. *See Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996) ("[W]hen the dispute lies not in the meaning of the Constitution, but in its application to a particular set of facts ... sec. 2254(d)(1) restricts the grant of collateral relief...."), *reversed on other grounds,* --- U.S. ----, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

What does it mean to say that a state court has "unreasonably" applied the proper law? It does not mean that a federal court may grant habeas relief simply because it disagrees with the state court's decision. This would amount to *de novo* review, which Congress clearly did not intend. *See* H.R.CONF.REP. No. 104-518 at 111 (1996), *reprinted in* 1996 U.S.C.C.A.N. 944, 944 (stating that the amended section "requires deference to the determinations of state courts that are [not] an "unreasonable application' " of federal law). Moreover, the mere fact that a district court disagrees with a state court does not render that state court's decision "unreasonable"; certainly two courts can differ over the proper resolution of a close question without either viewpoint being unreasonable. The Fifth Circuit has incorporated this principle into its interpretation of the statute, holding that under § 2254 a federal court can grant the writ "only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Drinkard v. Johnson,* 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997). We find this reasoning persuasive and adopt the Fifth Circuit's standard.

Thus, as we read the statute, a court evaluating a habeas petition under § 2254(d)(1) must engage in a three-step process: First, the court must "survey the legal landscape," using an inquiry similar to that under *Teague,* to ascertain the federal law applicable to the petitioner's claim that is

---

*Drinkard v. Johnson,* 97 F.3d 751, 767 (5th Cir.1996); *Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996), *reversed on other grounds,* --- U.S. ----, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). *But see* Larry Yackle, *A Primer on the New Habeas Corpus Statute,* 44 BUFF.L.REV. 381, 442 n. 192 (1996) (disagreeing with this interpretation).

"clearly established" by the Supreme Court at the time of the state court's adjudication. Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court case law, either because the state court failed to apply the proper Supreme Court precedent, or because the state court reached a different conclusion on substantially similar facts. If the state court's decision is not contrary to law, the reviewing court must then determine whether the state court unreasonably applied the relevant Supreme Court authority. The state court decision must stand unless it is not debatable among reasonable jurists that the result of which the petitioner complains is incorrect.

### 2. *Did the District Court Err in Applying § 2254(d)?*

#### a. *Ineffective Assistance of Counsel*

We now evaluate the district court's resolution of Neelley's claims. Neelley claims that her trial counsel, Robert French, provided ineffective assistance in violation of her Sixth Amendment right to counsel. She first argues that French was ineffective because he operated under a conflict of interest while representing her. Neelley asserted this claim in her second petition for state collateral relief, and the Alabama Court of Criminal Appeals ruled against her on the merits. *See Neelley v. State,* 642 So.2d 494, 504-05 (Ala.Crim.App.1993). Thus, this claim was "adjudicated on the merits in State court proceedings" and must be evaluated under § 2254(d).

Neelley points to a publicity contract between her and French entitling him to one-half of the profits from the commercialization of her story, in clear violation of the Alabama Rules of Professional Conduct. *See* ALA.RULES OF PROFESSIONAL CONDUCT Rule 1.8(d) (1991). Although this contract was not signed until three months after Neelley's trial, Neelley alleges that the execution of the contract was a mere formality, and that throughout her trial French exhibited signs that he was motivated by the possibility of profit. She asserts that French's conflict of interest

manifested itself in actions taken during his representation.  She alleges that during the trial French told Neelley of his plans to write a book about her case;  that French has subsequently copyrighted the brief he wrote for Neelley's direct appeal;  and that he has incorporated the majority of that brief into a 400-page manuscript for publication.  She also alleges that French began referring to her as his "million dollar baby" almost two months before she signed the contract.  Neelley notes that French by his own admission did not have previous experience with contracts of this kind, and that the presentation and execution of the contract so soon after the trial indicates that French must have researched and drafted the contract at least in part during the trial.  Finally, she points to various actions taken by French that she contends were designed to sensationalize her trial and give her story more media appeal.  Specifically, she argues that French failed to object to shocking and graphic evidence of the horrific nature of her crime, had her testify in gory detail regarding the crime and her motivation, failed to consult with her about the possibility of a plea bargain, and made inflammatory and sensational statements to the press.

Under the first step of the § 2254(d) inquiry we must ascertain the clearly established federal law as determined by the Supreme Court.  The cases that govern Neelley's claim are *Strickland v. Washington*[6] and *Cuyler v. Sullivan*.[7]  The Alabama Court of Criminal Appeals evaluated Neelley's claim under *Strickland* and *Cuyler*.  The facts of those two cases are different from the facts of Neelley's case;  thus, the state court's result cannot be said to be "contrary" to *Strickland* or *Cuyler*.  Its decision therefore is not "contrary to" clearly established federal law, and passes the second part of the § 2254(d) inquiry.  All that remains is for us to determine whether the Alabama court unreasonably applied *Strickland* and *Cuyler* to the facts of this case.

---

[6]466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

[7]446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

Under *Strickland,* a petitioner claiming ineffective assistance of counsel must prove both that her attorney was ineffective and that this ineffectiveness prejudiced her. Prejudice for *Strickland* purposes may be presumed if a defendant demonstrates that counsel "actively represented conflicting interests" and that this actual conflict of interest "adversely affected [her] lawyer's performance." *Cuyler,* 446 U.S. at 350, 348, 100 S.Ct. at 1719, 1718. The record indicates that the publicity contract in question was not signed until June 24, 1983, three months after Neelley's trial and the filing of her motion for a new trial. The state trial court found that the publicity contract created an actual conflict of interest, but ruled that the conflict did not adversely affect French's performance. The Alabama Court of Criminal Appeals disagreed, concluding that Neelley had failed to prove that French labored under an actual conflict of interest. On the contrary, the court stated that "it is clear from the record that [Neelley's] attorney zealously and wholeheartedly represented [Neelley's] interests ..., and earnestly participated in all aspects of the proceeding." *Neelley,* 642 So.2d at 504. As the court concluded that French had not operated under an actual conflict of interest as required for relief under *Cuyler,* it declined to address Neelley's particularized allegations of ineffectiveness. *See Neelley,* 642 So.2d at 504 (citing *Cuyler,* 446 U.S. at 349-50, 100 S.Ct. at 1719).

We cannot say that the Alabama appellate court unreasonably applied *Cuyler* to the facts of this case. Although it certainly appears that French's actions represent a serious violation of Alabama's ethics rules, it also appears that he competently represented her interests, and no others, throughout the course of the trial. Based on the record, it was not unreasonable for the Alabama Court of Criminal Appeals to find only the existence of a potential conflict of interest, rather than an actual conflict. The district court did not err in rejecting Neelley's

ineffective-assistance-of-counsel claim.[8]

### b. *Failure to Turn Over Materially Exculpatory Evidence*

Neelley also argues that the prosecution failed to turn over material exculpatory evidence. Soon after Neelley was arrested, authorities, including Investigator Tony Gilliland of the Chattooga County Sheriff's Office, searched the mobile home where she and her husband had lived and seized several documents, mostly correspondence between Neelley and her husband. Neelley's attorneys attempted to acquire these letters prior to trial, but Investigator Gilliland claimed that he did not know where the letters were. Neelley did not acquire the letters until February 1985, when Gilliland's estranged wife contacted Neelley's attorney and told him about the letters and their whereabouts. Neelley claims that this evidence would have aided her in her defense at trial because it would have shed light on her role in the offenses and her relationship with her husband. Neelley raised this claim in her first petition for state collateral relief and was denied relief by the Circuit Court of DeKalb County, Alabama.[9]

For purposes of this claim, the clearly established federal law is set out in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Under *Brady,* the government may not lawfully

---

[8]Neelley's ineffective-assistance-of-counsel claim also rested on other factual predicates. She alleged that French solicited and encouraged an improper sexual relationship with her, and that he failed to put on a defense based on battered-woman syndrome. The Alabama Court of Criminal Appeals rejected both of these claims. *See Neelley,* 642 So.2d at 497-509. Except to say that the Alabama court did not unreasonably apply clearly established law in rejecting these claims, they do not merit further discussion, *see* 11TH CIR.R 36-1, and we affirm the district court's denial of relief as to them.

[9]The Alabama Court of Criminal Appeals affirmed the denial of relief without opinion, *see Neelley v. State,* 531 So.2d 69 (Ala.Crim.App.1988), and both the Alabama Supreme Court and United States Supreme Court denied certiorari, *see Ex parte Neelley,* 537 So.2d 65 (Ala.1988); *Neelley v. Alabama,* 488 U.S. 1020, 109 S.Ct. 821, 102 L.Ed.2d 810 (1989).

convict a defendant if the government has suppressed material exculpatory evidence when the defense requested it. *See Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-97. *Bagley* holds that evidence is material if there is a reasonable probability—that is, a probability sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different had the defense had the evidence. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. The DeKalb County circuit court determined that the state had indeed wrongfully withheld the letters from Neelley's attorneys, but concluded there was no reasonable probability that introduction of the letters would have changed the outcome of the trial. In so doing, however, the court contravened the Supreme Court's command that evidence must be analyzed collectively, not item by item, for *Bagley* materiality. *See Kyles v. Whitley,* 514 U.S. 419, 436, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).[10] The DeKalb County circuit court, the only Alabama court to have written on this point, analyzed each letter for its likely individual effect on the outcome of the trial, but did not analyze the letters' collective effect. This piecemeal approach is "contrary to" clearly established federal law; therefore, we must independently consider the merits of Neelley's claim.

The majority of the withheld evidence consists of correspondence between Neelley and her husband. Neelley argues that these letters would have supported her defense at trial that she was completely dominated by her husband. Some of these letters contain references that might have

---

[10]Although *Kyles* was decided in 1995, eight years after the Alabama court's denial of Neelley's petition for collateral relief, the *Kyles* Court characterized its opinion as a mere explanation of the rule already set forth in *Bagley. See Kyles,* 514 U.S. at 434, 115 S.Ct. at 1565-66. In fact, this court has stated that *Kyles* did not announce a new rule. *See Hays v. Alabama,* 85 F.3d 1492, 1498 (11th Cir.1996) ("The Supreme Court recently decided *Kyles v. Whitley* ..., which discussed the "reasonable probability' standard of *Brady.* Without announcing new rules, the Court cited four guideposts for determining materiality."), *cert. denied,* --- U.S. ----, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997) (citations omitted). Thus, for purposes of this case we consider this aspect of materiality analysis to have been clearly established in 1985 in *Bagley,* and thus clearly established at the time the DeKalb County circuit court ruled on Neelley's claim.

been helpful to Neelley's defense; in some letters Neelley refers to her husband as having telepathy or "ESP," and others show that she feared what he would do to her if he became angry. However, most of the letters are written in a loving and spirited, rather than meek or submissive, tone. Indeed, in some of the letters Neelley plainly defies some of her husband's demands and threats that she feels are excessive. The remaining three documents in question are barely probative, much less exculpatory.[11] Considering the possible effect of all of the documents at issue, there is no reasonable probability that their introduction would have enhanced Neelley's chances of a favorable outcome at trial. To the extent that the documents could be read to support Neelley's claim of total domination by her husband, they were merely cumulative of many other similar pieces of correspondence that were introduced by the defense at trial. *Cf. Arizona v. Youngblood,* 488 U.S. 51, 71, 109 S.Ct. 333, 344, 102 L.Ed.2d 281 (1988) (to be material, exculpatory evidence must be more than merely cumulative). Thus, we affirm the district court's denial of relief on Neelley's *Brady* claim as well.

CONCLUSION

For the aforementioned reasons, we conclude that the district court did not err in denying Neelley's petition for a writ of habeas corpus.

AFFIRMED.

---

[11]One of the pieces is a letter written on Neelley's behalf from Marion Mixon, an attorney in Albany, Georgia, to the Georgia Department of Human Resources, which Neelley claims would have aided her in contacting this former attorney. However, Neelley made no showing that she could not have contacted Mixon without the letter; indeed, a letter from Alvin Neelley introduced at trial refers to Mixon. The second piece is a letter to Alvin Neelley's mother from his former wife, which has no bearing on Judy Neelley's defense. The final piece is a document with the heading "Classification Committee Actions" that shows Alvin Neelley's job assignment in prison as that of Chaplain's Aide.